## McAndrew v. McAndrew.

(Decided December 16, 1921.)

### Appeal from Jefferson Circuit Court
#### (Common Pleas Branch, Second Division).

1. Divorce—Grounds.—Where the only ground alleged in the petition for divorce is "such cruel beating or injury or attempt at injury of the wife by the husband as indicates an outrageous temper in him or probable danger to her life or great bodily injury to her from remaining with him," the plaintiff is a competent witness, but evidence of what defendant did or said at times not connected with any alleged beating or injury of the plaintiff is incompetent and evidence of what he did to other persons is also incompetent.

2. Divorce—Fraud in Obtaining Marriage Contract.—A defendant may be granted a divorce upon a counterclaim alleging fraud in the obtention of the marriage contract where it is shown that the wife, to induce the husband to marry her, represented to him that she was a widow and that her infant child was the result of a former marriage, when in truth she had never been married and the child was illegitimate.

DELOZIER MOSLEY for appellant.

ALLEN P. TODD and CHARLES F. TAYLOR for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Reversing in part and affirming in part.

In this proceeding both parties sought divorce, the plaintiff, Lillian McAndrew, on the statutory ground, "such cruel beating or injury or attempt at injury of the wife by the husband as indicates an outrageous temper in him, or probable danger to her life or great bodily injury to her from remaining with him," and the defendant by counterclaim wherein he charged that the plaintiff had procured the marriage by fraud in that she had represented herself before their marriage to him as the widow of Thomas King, deceased, and her three-year-old child as the legitimate fruit of that marriage, whereas she had never before been married and her child was illegitimate.

She was born and reared in Louisville and at the time of her marriage to appellant was thirty-one years of age. He came from the oil fields of Kansas to Scottsville, Kentucky, where he engaged in the oil business and in the organization of oil companies and the sale of stock and was at the time of the marriage forty-eight years of age.

While in Louisville, a stranger, he met, through his partner and appellee's brother-in-law, E. D. Noe, for the first time the appellee and a brief courtship ensued culminating in marriage June 3, 1919. Before their marriage he gave her a number of presents, among them a diamond ring costing $375.00, a larger diamond ring, $1,100.00, another ring of less value, an automobile, and a thousand dollars in money to buy furniture for their home. Immediately following the marriage ceremony he presented her with a deed to a house and lot in Louisville for which he had just paid $8,500.00. In fact he gave her all his visible property except his wearing apparel and personal belongings and some shares of stock in oil companies which he had organized. After two or three days' bridal trip, the couple returned to the home, all furnished, which he had given his wife, and trouble began that evening. She says he kicked her pet dog and spoke ill, that night, to her mother who was in the home for the purpose of living with them. He denies this, but says that after they retired for the night he modestly suggested to her that her mother should not undress in the presence of the family as it was embarrassing to him, whereupon she became infuriated and said a number of ugly and unkind things to him, but this trouble was patched up. Matters steadily grew worse from that time. He bought a few cases of whiskey, of which he says she was very fond and drank so much of it and as a consequence was so ill-behaved, he decided to give the balance of the liquor to a hospital and so suggested to his wife, but she dissuaded him promising not to drink to excess again. She says he was addicted to drink and she had to hide the whiskey to keep him sober, and denies that she drank to excess. They celebrated the fourth of July with some drinks and a family row. The big event was staged at night July 10th, when both became more or less intoxicated and created such a disturbance as to collect a large and curious crowd in front of the house and on the porch. Among them were three policemen whom the wife had called. About this trouble she testifies in substance that after they went to bed he became abusive to her. To avoid his beastly demands she arose in the dark from the bed and went into her mother's room. He followed her and seized her and began to beat her, whereupon she began to scream, which aroused her sleeping mother, who got up and attempted to rescue plaintiff but was knocked down by defendant and badly injured, and plain-

tiff was dragged back to bed, where defendant continued to hold and beat her until the policemen came. The defendant denies all this, and says that he did not strike plaintiff, but that when they were in the room of the mother plaintiff grabbed him and began to scream as though he was beating or injuring her. This awakened her mother who took the part of her daughter and struck him, after which he pushed her down and she ran down stairs and screamed so that the crowd gathered to see what was the matter and the police came, who, at the instance of the wife, took defendant to jail.

After telling of a number of scraps with her husband, the plaintiff says: "Mr. McAndrew demanded that I submit to him several times every night." This, she says, was more that she could stand, and her health, which had been robust, was ruined. This is vigorously denied by defendant, who says he was in poor health and did not desire or insist upon frequent intercourse. As he was forty-eight and not in good health and she was only thirty-one and full of pep this statement of plaintiff is not consonant with the general experience of mankind and disproves itself.

The petition avers that defendant beat plaintiff and relies upon no other ground for divorce. She testifies he struck her on different occasions, and on the night of July 10th held and beat her. If this be true she was entitled to divorce. Although her mother and other relatives were in the house at the time she says she was cruelly beaten, no one was called to corroborate her statement. One policeman testified about the arrest of the defendant at the instance of the plaintiff, but he did not see any beating nor marks or signs of the alleged beating on the plaintiff. The evidence shows that the plaintiff had a very bad temper and was easily provoked to anger and to the use of abusive language. One of her friends and associates testified in answer to a question: "Lillian has always had a very bad disposition, very bad; an awful temper and an awful disposition." Another lady friend testified plaintiff had a very bad temper. This is corroborated by other evidence. Although many witnesses were asked as to defendant's disposition no one except the plaintiff, and she was incompetent, gave evidence tending to prove him an unruly or disagreeable person, but, on the contrary, several deposed that he was mild mannered and agreeable. We think the whole cause of the trouble was the lack of love if not actual dislike

by the plaintiff of the defendant at the time of the marriage as well as throughout their wedded life. In addition to her admissions that she did not love him it is shown in evidence that she said to her friends on different occasions before the marriage that she did not love him, that she was marrying him for his money and a home, and that he might soon die and she could marry again. It is further shown by evidence that after her marriage to defendant she had clandestine meetings with young men with whom she declared she was in love. She alone of all the witnesses gave herself a good reputation. Notwithstanding she asked and was granted a divorce on her sole testimony she was contradicted in many material respects by other witnesses. This court is now asked to concur in the decree of the chancellor.

She represented to the defendant before marriage that she was the widow of one Thomas King who had been killed in an automobile accident in August, 1918; defendant married her believing her to be such widow and her child the lawful issue of such marriage. He knew nothing of her previous life. She testified that she was married to Thomas King and lived with him for some years, yet she did not and could not produce a single witness to that fact or any fact corroborative of her statement further than that she had claimed she had been married to King. None of her family who testified gave any such evidence. The certificate of marriage which she at first boasted she had was never produced and she later attempted to excuse her failure to do so by saying that she had given the paper to her former husband, now dead, and did not know its whereabouts. She testified that she was married to King in Yonkers, New York, on June 24, 1916, but the records of that place fail to corroborate her, although the clerk testified that a complete record of marriages was kept in his office. There was no record of the marriage of the plaintiff in the name of Lillian King or Lillian Hermes in the Yonkers office. It would hardly be possible for a girl to keep her marriage a secret from her entire family and friends, especially when she became a mother in the family home. Her alleged mother-in-law, Mrs. John King, testified that she did not know of nor had she heard of, the marriage of her son, Thomas King, to the plaintiff, and asked plaintiff for evidence of the alleged marriage when she presented herself and child as his widow and infant. The overwhelming weight of the evidence is against appellee's claim of widowhood

and establishes that her marriage to defendant was her first venture in the matrimonial field. Her representation concerning her former marriage and legitimacy of her child to a suitor who did not know the facts nor have a fair opportunity to learn them was such fraud on her part as to entitle the defendant to an annulment of the marriage relation as prayed in his counterclaim. The facts of this case distinguish it from the case of Wesley v. Wesley, 181 Ky. 135, in that Wesley knew, or by the exercise of ordinary prudence could have known, before marriage of the licentious conduct of the woman whom he afterwards married for they had lived in the same community for a long time and he knew her well. She was not entitled to a divorce, but the chancellor having decreed divorce to her the judgment is not reversible in so far as it relates to the bonds of matrimony, but we are at liberty to reverse only that part of the judgment granting alimony and fixing the property rights of the parties. As plaintiff was not entitled to a divorce she was not entitled to alimony.

The judgment allowing her alimony in the sum of $4,000.00 is reversed with directions to dismiss her petition in that respect, but the judgment in all other respects is affirmed. The defendant is liable for the costs and attorney fee allowed to plaintiff's counsel.

Judgment reversed in part and affirmed in part.

Whole court sitting.